APPEAL OF THE FARMERS COOPERATIVE ASSOCIATION.

Docket No. 4296.   Decided October 13, 1926.

The fixed payments made by a Kansas cooperative corporation to its stockholders upon the capital stock in accordance with a statute providing for "fixed dividends" *held* not deductible as interest.

*Warren H. White, Esq.*, and *A. C. Johnson, C. P. A.*, for the petitioner.
*Briggs G. Simpich, Esq.*, for the Commissioner.

Deficiency of $991.83, income tax for 1920, of which not all is in controversy. The petitioner contends that fixed payments on capital stock are deductible as interest.

FINDINGS OF FACT.

The petitioner was incorporated under the laws of Kansas in 1915 by certain of the farmers in the vicinity of Hays, Kans. Its purposes are stated in its charter as follows:

(a) The conversion and disposal of all agricultural products by means of mills, elevators, stores or otherwise.

(b) Buying and shipping grain for profit.

(c) Cleaning and handling of grain for its members and others.

[(d) Omitted in original.]

(e) Buying and selling of coal, flour, farm supplies and other merchandise, including livestock for mutual benefit of its shareholders and such other benefits as the shareholders direct.

The constitution contains the following provisions, among others:

### ARTICLE VII—RESERVE FUND.

·· After the payment of the operating expenses of this association, the remaining profits, if any, two per cent shall be set apart for a reserve fund and carried on the books as a reserve fund for the payment of any unexpected losses, not otherwise provided for. The reserve fund may be invested or loaned to· stockholders, provided that a part of said fund may be used in the payment of interest on capital stock, at the direction of the directors.

### ARTICLE VIII—CAPITAL STOCK.

·Section 1. The capital stock of this Association shall be ($50,000) fifty thousand dollars, divided into one thousand (number of shares) at the par value of fifty dollars per share, this stock shall be non-assessable.

Section 2. And at least fifty per cent of the face of all shares subscribed shall be paid for in cash; and in case of deferred payments, such payments shall· be settled for in full by note secured by the capital stock for which note is taken, as part payment; all such notes to mature in six months from date of issue.

Section 3. All shares shall be transferable to members of the F. E. & C. U. of A. at the option of the holder and the Directorate, and recorded on the books of the Association, Provided, That any credit due the Association by the holder of said stock shall be deducted from said stock before being transferred.

### ARTICLE IX—INTEREST ON STOCK.

(a) After the reserve fund of two per cent is deducted from the profits, pay interest on stock what it earns up to 8 per cent; but no interest shall be paid on any shares of stock that are not paid in full at the time of the annual settlement; and interest shall be paid only from and after date when said shares are paid in full, all interest to become due on the annual settlement. And if any member of said association is found delinquent in his local, such amount shall be taken out of his interest and dividends and paid to his local secretary on or before the 15th day of January of each year.

. (b) Provided that stockholders before drawing their interest or dividend, from the Association shall present receipt or membership card from their local showing that they are in good standing in the F. E. & C. U. of A.

### ARTICLE X—NET PROFITS.

The net approximate profits of the business shall be paid to the members of the association at the close of each year after having been prorated on the amount of their purchases or sales, for, or by themselves or families during the year. Provided, that if a stockholder holds only one share, his dividend shall be applied on his second share until the full amount of said second share shall be paid in full, Provided, further, that the profits from non-stockholders' business shall be retained as a reserve fund.

## ARTICLE XIII—MANNER OF CONDUCTING BUSINESS.

(a) All money received on account of shares, contributions or otherwise, shall be paid to the Treasurer, unless otherwise ordered by the directors, and said money shall be withdrawn only by a vote of the board of directors, on the written order of the President, countersigned by the Secretary.

(b) Such funds as the association may have, not needed for immediate use, in said association's business or to meet accruing liabilities, shall with the consent of the association, given at any regular meeting, be invested by the directors.

(c) All business of the association shall be conducted on a cash basis; provided, credit may be extended to stockholders not to exceed the amount of their capital stock; any credit above this amount may be applied for to the directors. Produce or labor taken in exchange for merchandise, and merchandise and produce on deposit at net cash value will be considered as cash.

(d) Goods shall be purchased and sold at ordinary market prices to all alike.

(e) All members trading or selling with the association shall be furnished statements showing the amount of their purchases and said statements shall be the basis for computing dividends on purchases or sales, and any said statements transferred shall be void and not binding on the association.

(f) Dividend duplicates shall be issued only for goods purchased and sold at regular retail prices; said goods to be purchased for use of members of this association or their families.

(g) The business manager or trades agent shall keep a sales book showing correct list of all sales, the amount and prices of said sales, the name of purchaser and the kinds of goods sold; this sales book shall be balanced daily and show total sales for each day, week and month for the purpose of aiding in computing the per cent of dividend on purchases for each year, and said sales book shall be kept open for the inspection of any member of the association.

## ARTICLE XXIII—DECEASED MEMBERS.

Any member of the association dying in said locality, the directors may repay to his legal representatives the face value of the capital stock owned by said member, together with all accrued interest and purchased dividends within twelve months after the absence of said member.

## ARTICLE XXV—DISSOLUTION.

In case the members of the association require a dissolution—after the debts of the association are paid, the stock and property of the association remaining, or the proceeds of the sale thereof, shall be divided among the shareholders in proportion to their shares of paid up stock. In case of disagreement among the stockholders, in such division the matter shall be settled by arbitrators as follows: One to be chosen by the officers and directors, one by the other members, and the third by the first two; and their decision shall be final.

The petitioner's capital stock originally consisted of 200 shares of $50 each. This was increased to 500 shares in 1919 and to 1,000 shares in 1920. All stockholders are farmers. It handles the products of and does business with farmers in the community who are not stockholders.

In addition to wheat, it handles potatoes, cabbage, apples and other fruit and feed which it purchases from members and non-members. It also purchases coal and sells it to any one who wants it.

The corporation insures all the wheat in its elevators and is the beneficiary named in the policy.

In every year except one during the corporation's existence it has paid 8 per cent to the stockholders upon the outstanding capital stock. The 8 per cent is paid out of earnings from both stockholders' and non-stockholders' business, and payment is made annually in February out of the earnings of the preceding year. The exception was in 1922. In that year there were not enough earnings to make the payment; there was a loss and no accumulated surplus. When the corporation failed to pay the 8 per cent for 1922 no entry was made upon the books in respect thereof, either as a liability or otherwise. The corporation intends at some time in the future to pay the 8 per cent which it omitted to pay for the year 1922.

At the time the farmer delivers his wheat a price is fixed in cents per bushel; the corporation pays him for it and takes title. It issues to him a "scale ticket" which shows the quantity and quality of the wheat delivered, the price per bushel, and the total amount paid. At the end of the year, after all necessary payments including the 8 per cent on the stock have been made, the remaining earnings are distributed in accordance with a computation based upon the quantity and price of grain or produce delivered each day by each farmer to the corporation. Each stockholder receives a single check, which includes the 8 per cent, and also his pro rata distributive share of the remaining earnings. For example, one stockholder received a check for $283.04 which represented "$210.06 refund on wheat, $22.15 on merchandise, and $50.83 for interest on capital stock." This payment is accounted for by charging the entire amount against surplus. The surplus account consists of the profits shown by the profit and loss statement before any deduction of the 8 per cent stockholders' distribution.

On its tax return the petitioner deducted the 8 per cent payments upon its capital stock as interest.

OPINION.

STERNHAGEN: Although there was in the presentation of the case some confusion as to whether the petitioner's tax liability is affected by the exemption provision of section 231 (11) of the Revenue Act of 1918, it seems to be clear that the only question before us for decision is whether, under the circumstances of its organization and operation, the amount paid out by the corporation to its stockholders

as 8 per cent on its capital stock is in truth interest and therefore a proper deduction.

The question of the nature of this payment as a matter of law can only be decided by looking to the source of the obligation under which it is paid. Since the corporation was organized under the Kansas law governing cooperative associations, we may look to that statute. Kansas Laws, 1913, chapter 137, after authorizing the organization of corporations under the cooperative plan, defines such plan "to mean a business concern that distributes the net profits of its business by: First, the payment of a fixed dividend upon its stock; second, the remainder of its profits are prorated to its several stockholders upon their purchases from or sales to said concern or both such purchases and sales." The petitioner here conducted its business in accordance with this plan. It will be seen that the basis of the plan is a prescribed distribution of "net profits" as between a "fixed dividend" upon stock and a pro rata distribution of the remaining profits upon the basis of the amount of business done with each stockholder. This is exactly what the petitioner here did, and no matter how thoroughly its contributing stockholders believed that they were investing their money or lending it at 8 per cent, and notwithstanding the equivocal language of the constitution, the legal nature of the payment is exactly what the statute describes as a distribution of net profits by way of a fixed dividend upon the stock. The fact that 8 per cent happened to be the rate at which banks were lending money, or the fact that the president testified that the corporation some day intended to make up for the dividend which it passed in 1922, does not establish a legal obligation as for interest. See *Sacred Heart Cooperative Mercantile Co.*, 2 B. T. A. 24.

> *Judgment will be entered for the Commissioner.*

LANSDON did not participate.